1
2
3
4
5
6
7
8
9
10
11
12
13

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                                             )
RADIO SYSTEMS CORPORATION, *et al.*,   )          No. C10-828RSL
                                                             )
                                      Plaintiffs,      )
                                                             )          ORDER GRANTING IN PART
               v.                                       )          PLAINTIFFS' MOTIONS IN
                                                             )          LIMINE
                                                             )
                                                             )
TOM LALOR, *et al.*,                             )
                                                             )
                                      Defendants.   )
_____)

14
15
16
17
18
19
20
21
22
23
24
25
26

This matter comes before the Court on "Plaintiffs' Motions in Limine." (Dkt. # 80).
Having reviewed the memoranda, declarations and exhibits submitted by the parties, the
remainder of the record, and the evidence and arguments presented during the September 8,
2014, hearing, the Court finds as follows:

**1.      Testimony of Mark R. Hennings**

Plaintiffs seek to exclude the testimony of Defendants' infringement expert witness, Mark
R. Hennings. Dkt. # 80 at 1-9. Specifically, Plaintiffs argue that Mr. Hennings lacks the
requisite scientific, technical, or other specialized knowledge to qualify as an expert in the
pertinent art under Fed. R. Ev. 702 ("Rule 702") and therefore, his testimony is inadmissible. Id.
at 3-6. The Court agrees.

1

Pursuant to Rule 702:

2

A witness who is qualified as an expert by knowledge, skill, experience, training, or
education may testify in the form of an opinion or otherwise if: (a) the expert's
scientific, technical, or other specialized knowledge will help the trier of fact to
understand the evidence or to determine a fact in issue; (b) the testimony is based on
sufficient facts or data; (c) the testimony is the product of reliable principles and
methods; and (d) the expert has reliably applied the principles and methods to the
facts of the case.

3

4

5

6

Fed. R. Ev. 702.  In <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993), the Supreme

7

Court charged trial judges with the responsibility of acting as gatekeepers to prevent unreliable

8

expert testimony from reaching the jury.  The gate-keeping function applies to all expert

9

testimony, not just testimony based on science.  <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137

10

(1999).  "[T]he word knowledge connotes more than subjective belief or unsupported

11

speculation."  <u>Samuels v. Holland Am. Line-USA Inc.</u>, 656 F.3d 948, 952 (9th Cir. 2011)

12

(internal quotation marks omitted).  In general, the expert's opinion must be based on principles,

13

techniques, or theories that are generally accepted in his or her profession and must reflect

14

something more than subjective belief and/or unsupported speculation.  <u>Daubert</u>, 509 U.S. at

15

590.  To be admissible, expert testimony must be both relevant and reliable.  <u>United States v.</u>

16

<u>Vallejo</u>, 237 F.3d 1008, 1019 (9th Cir. 2001).  In examining reliability, the Court's inquiry is

17

whether the expert's testimony has "a reliable basis on the knowledge and experience of the

18

relevant discipline."  <u>Kumho Tire</u>, 526 U.S. at 249 (citation and alterations omitted).  Whether

19

an expert witness has sufficient qualifications is within the Court's discretion.  <u>Cooper v. Brown</u>,

20

510 F.3d 870, 877 (9th Cir. 2007).  Defendants, as the parties offering Mr. Hennings' expert

21

testimony, have the burden of establishing its admissibility.  <u>Bldg. Indus. Ass'n of Wash. v.</u>

22

<u>Wash. State Bldg. Code Council</u>, 683 F.3d 1144, 1154 (9th Cir. 2012).

23

A district court's decision to admit expert testimony under <u>Daubert</u> in a patent case

24

follows the law of the regional circuit.  <u>Micro Chem., Inc. v. Lextron, Inc.</u>, 317 F.3d 1387, 1390-

25

91 (Fed. Cir. 2003).  Patent claims and issues of infringement and validity are analyzed from the

26

perspective of one of ordinary skill in the art.  <u>Sundance, Inc. v. DeMonte Fabricating Ltd.</u>, 550

ORDER GRANTING IN PART
PLAINTIFFS' MOTIONS IN LIMINE                    -2-

F.3d 1356, 1361 (Fed. Cir. 2008).  Thus, the Federal Circuit has held that permitting a witness to testify as an expert about issues of infringement or validity is an abuse of discretion unless that person has specialized knowledge, training, or experience in the pertinent art.  Id. at 1363.

Having reviewed Mr. Hennings' report, the opinions set forth therein, and his curriculum vitae, and having heard Mr. Hennings' testimony at the September 8, 2014, Daubert hearing, the Court finds that he is not qualified as an expert in the relevant discipline.  Mr. Hennings' educational background includes a bachelor of science in biological sciences, two masters of engineering, one in computer science and one in digital systems, and a juris doctor.  Dkt. # 81-3 at 30.  Mr. Hennings has spent the past 14 years working as a patent attorney, drafting and prosecuting patent applications in the fields of computer and software technology, semiconductors, digital signal processing, telecommunications, and cryptography.  Id. at 31.  Before working as a patent attorney, Mr. Hennings worked for more than 15 years as an electrical and computer design engineer in aviation electronics, computer architecture design, integrated circuit design, and software design.  Dkt. # 81-2 at 2.

As detailed above, Mr. Hennings has significant credentials and experience in computer science and digital processing.  However, the parties agree that the claims at issue in this case are directed to the configuration and construction of the housing of an animal collar, not the electrical components within the collar housing.  Dkt. # 80 at 2; Dkt. # 89 at 2.  Mr. Hennings acknowledges in his report that "an understanding of the patents-in-suit begins with an understanding of animal training collars" and the relevant art in this case is the "field of animal training collars."  Dkt. # 81-2 at 3. His experience in this field, however, is limited to his wife's and his father's use of training collars with dogs several years ago.  See Dkt. # 81-4 at 7-11; Dkt. # 81-3 at 30-32.  In the context of this patent litigation, expertise in the field of animal collars requires more than a general awareness of the purpose and basic operation of animal training collars as the key issues involve the structural components of the patented collar.

Defendants contend that Mr. Hennings is qualified in the relevant field because he has

been trained in mechanical design and robotics.  Dkt. # 89 at 3.  According to Mr. Hennings'

declaration, he gained knowledge about the physical aspects of computer systems and electronic

circuits while working on circuit boards.  Dkt. # 89-1 ¶ 2.  He also took two classes in robotics

approximately 30 years ago while studying for his masters degrees.  Id. ¶ 4.  This experience and

training, however, is insufficient to qualify Mr. Hennings as an infringement expert in this case

under Rule 702.

      Contrary to Defendants' contention, Mr. Hennings' experience as a patent attorney does

not make up for his lack of relevant technical expertise.  Defendants argue that Mr. Hennings'

"expertise is in the area of applying properly construed claims to an electro-mechanical device"

based primarily on his legal training and his experience as a patent attorney.  Dkt. # 89 at 3.

However, the Federal Circuit has made clear that this experience alone is insufficient to qualify a

person as an expert under Rule 702.  While "patent lawyers are often qualified to testify as

technical experts . . . such qualification must derive from a lawyer's technical qualifications in

the pertinent art," not merely the lawyer's legal training.  Sundance, Inc., 550 F.3d at 1363.

Here, Mr. Hennings' experience as a patent attorney cannot remedy the absence of expertise in

the pertinent art.

      Defendants argued during the September 8, 2014, Daubert hearing that Mr. Hennings

needs no stronger qualifications in order to testify as an expert because he would not be asked to

testify about highly-sophisticated matters related to the pertinent field.  However, this argument

only underscores the fact that Mr. Hennings' testimony would not elucidate technical aspects of

the case for the jury or otherwise provide the type of insight that allows experts to assist the

triers of fact.  Instead, it suggests that the primary effect of allowing Mr. Hennings to testify

regarding infringement would be to lead jurors to legal conclusions that are based on Mr.

Hennings' experience as a patent attorney; the Court should not permit this outcome.  See id. at

1364-65 ("Allowing a patent law expert without any technical expertise to testify on the issues

of infringement . . . amounts to nothing more than advocacy from the witness stand").  For these

ORDER GRANTING IN PART
PLAINTIFFS' MOTIONS IN LIMINE         -4-

reasons, the Court GRANTS Plaintiffs' request to exclude Mr. Hennings' testimony.

**2.  Testimony of Scott Cragun**

Plaintiffs also challenge the admissibility of Defendants' damages expert's testimony regarding a reasonable royalty rate. "By statute, reasonable royalty damages are deemed the minimum amount of infringement damages 'adequate to compensate for the infringement.' " LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 66 (Fed. Cir. 2012) (quoting 35 U.S.C. § 284). The reasonable royalty rate is derived from a hypothetical negotiation between the patent holder and the infringer at the time the infringement began. The goal of the exercise is "to discern the value of the patented technology to the parties in the marketplace when infringement began." Id. at 76. "A comprehensive (but unprioritized and often overlapping) list of relevant factors for a reasonable royalty calculation appears in Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)." ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 869 (Fed. Cir. 2010). The factors are:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

Georgia-Pacific, 318 F. Supp. at 1120.  Although the negotiation is theoretical, "a reasonable royalty analysis requires a court to hypothesize, not to speculate.  At all times, the damages inquiry must concentrate on compensation for the economic harm caused by infringement of the claimed invention." Resqnet.com, Inc., 594 F.3d at 869 (internal citations omitted).

Plaintiffs do not challenge Mr. Cragun's use of the Georgia-Pacific factors.  Instead, Plaintiffs seek to exclude Mr. Cragun's testimony because (1) he failed to adequately state the basis of his opinion, (2) his report improperly relies on the royalty rates of license agreements for products that are not related to the technology of the patent in suit, and (3) his report relies on the profitability of multi-component pet training and confinement systems, rather than just those

ORDER GRANTING IN PART
PLAINTIFFS' MOTIONS IN LIMINE                    -6-

of pet collars.  Dkt. # 80 at 10-13.  Plaintiffs also argue that Mr. Cragun's royalty rate analysis is unreliable because he used the prices listed on Plaintiffs' website to calculate Plaintiffs' alleged profits from the accused products rather than reviewing actual profit figures.  Id. at 13.

With respect to Plaintiffs' first argument, Mr. Cragun's report does not fail for lack of analysis or explanation.  Contrary to Plaintiffs' suggestion, there is no requirement under Rule 702 that a proffered expert make complicated mathematical calculations.  WWP, Inc. v. Wounded Warriors Family Support, Inc., 628 F.3d 1032, 1040 (8th Cir. 2011).  An expert must explain the methodology and principles underlying his or her opinion and the opinion must provide more than just a conclusion.  Mr. Cragun's report meets these threshold requirements.  Mr. Cragun's report explains his application of the Georgia-Pacific factors to the facts of this case and how they support his opinion.  Dkt. # 85-1 at 4-22.  Furthermore, the Georgia-Pacific factors are qualitative and therefore, do not lend themselves well to precise mathematical analysis.  See Georgia-Pacific, 318 F.Supp. at 1120.

Turning to Plaintiffs' second argument, the Court agrees with Plaintiffs' concern that the license agreements relied upon by Mr. Cragun are not related to the technology of U.S. Patent No. 7,267,082 ("the '082 Patent").  Because the patentee in this case, Defendants, have not licensed the '082 Patent and therefore, there is no established royalty, Mr. Cragun determined the starting point for the hypothetical negotiation by reviewing the rates paid by the licensee, Plaintiffs, pursuant to other license agreements under the second Georgia-Pacific factor.  Dkt. # 85-1 at 8.  Mr. Cragun examined seven license agreements and the royalty rates Plaintiffs agreed to pay for exclusive or non-exclusive rights to patented technology in the pet products industry.  Id. at 8-13.  The targeted products of these agreements are 1) a tag that attaches to a pet's collar for location purposes, 2) an anti-bark collar and spray technology, 3) a sensor that attaches to a collar to unlock a pet door when the animal is close, 4) a self-cleaning litter box assembly, 5) a heating and cooling method for pet products, 6) an integrated pet collar, and 7) an ingestible animal temperature sensor.  Id.  Mr. Cragun also reviewed a license agreement resulting from a

ORDER GRANTING IN PART
PLAINTIFFS' MOTIONS IN LIMINE                    -7-

settlement in which Plaintiffs agreed to license to a third party the use of its patented technology related to a confinement and remote training system.  Dkt. # 85-1 at 11-12; Dkt. # 85-2 at 5-6.  Although these products are within the realm of pet products, the specific technology of five of these license agreements is not comparable to the technology at issue in this suit.

The patented technology in this litigation is a pet training collar.  Dkt. # 81-1 at 15-31.  The Court finds that the only three license agreements that relate to the patented technology in this case are the license agreements directed toward the confinement and remote training system which arose out of a settlement, the anti-bark collar, and the integrated collar.  Dkt. # 85-1 at 11-12.  The other license agreements "had no relation to the claimed invention. . . [,] even mentioned the patents in suit or showed any other discernible link to the claimed technology."  ResQnet.com, Inc., 594 F.3d at 870.  While those license agreements address products in the pet industry, Mr. Cragun testified that the patented technology of those particular products is not very comparable to the patented technology in this case.  Dkt. # 85-2 at 5-7.  Yet, he relied on those license agreements to conclude that a royalty rate of five dollars per unit would be appropriate to measure the damages in this case.  Dkt. # 85-1 at 22.  Mr. Cragun's report acknowledges that the license agreements contain differences in technology, exclusivity, territory, and the circumstances under which they arose, yet he does not clarify how he accounted for these differences in reaching his conclusion.  Id. at 13.  Without more, Mr. Cragun's consideration of the five unrelated license agreements renders his opinion insufficiently reliable and not helpful to the jury.  See ResQnet.com, Inc., 594 F.3d at 873 (Failure to account for the technological and economic differences of license agreements and the patent-in-suit "violates the statutory requirement that damages under § 284 be 'adequate to compensate for the infringement.' "); see also Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1316 (Fed. Cir. 2011) ("[a]ny evidence unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute.") (quoting ResQnet.com, 594 F.3d at 869).  The Federal Circuit has made clear that a patent holder cannot

ORDER GRANTING IN PART
PLAINTIFFS' MOTIONS IN LIMINE                    -8-

rely on license agreements radically different from the hypothetical agreement to reach a reasonable royalty rate. <u>Uniloc USA, Inc.</u>, 632 F.3d at 1316.

As for Plaintiffs' third argument, the Court is not persuaded that Mr. Cragun's consideration of the success of training systems containing the pet collar and other components decreases the reliability of his analysis. Mr. Cragun considered both the success of these larger systems and individual pet collars under the eighth <u>Georgia-Pacific</u> factor and acknowledged the differences between the two in his analysis. Dkt. # 85-1 at 15-16.

Finally, the Court finds that Mr. Cragun's reliance on prices listed on Plaintiffs' website rather than Plaintiffs' actual profit from the accused products is a proper topic for cross-examination. Arguments regarding the accuracy of the facts on which he relied goes to the proper weight to be afforded to the evidence, not its admissibility. <u>i4i Ltd. P'ship v. Microsoft Corp.</u>, 598 F.3d 831, 856 (Fed. Cir. 2010).

The Court will permit Mr. Cragun to testify if the concerns raised in Plaintiffs' second argument are addressed. Mr. Cragun must remove the five unrelated license agreements from his analysis, recalculate the reasonable royalty rate, account for any differences between the remaining licenses, and, if the royalty rate remains unchanged from five dollars per unit, explain why it has not changed. Defendants must supply Plaintiffs with a supplemental report containing Mr. Cragun's revised analysis and findings, and the Court will consider permitting Plaintiffs to depose Mr. Cragun prior to trial.

The Court takes this opportunity to remind the parties that because there are no claims of infringement of U.S. Patent No. 6,830,014 (filed Aug. 5, 2003) ("the '014 Patent") remaining, Mr. Cragun's proposed testimony regarding damages as to the '014 Patent is not relevant. Similarly, Defendants' claims regarding the GS-011, the FieldPro, and the SD-1825 have been dismissed. Therefore, any proposed evidence regarding damages resulting from these particular products is no longer relevant and will not be admitted.

**3.     Testimony of Tom Lalor**

Plaintiffs seek to limit Mr. Lalor's testimony to facts and preclude any testimony that may appear to cross-over to into the realm of expert opinion testimony under Rule 702.  Dkt. # 80 at 14.  Defendants do not dispute that they did not disclose Mr. Lalor as an expert witness pursuant to Rule 702 and Mr. Lalor has not provided an expert report as required by the Federal Rules of Civil Procedure.  Dkt. # 89 at 7.  Based on Plaintiffs' admission that they do not intend to have Mr. Lalor provide expert testimony under Rule 702, the Court GRANTS Plaintiffs' request.

**4.    Testimony of Dennis Robins, Murry Nunn, and Kenneth Xiong**

Plaintiffs ask the Court to preclude Dennis Robins and Murry Nunn from testifying as to "Mr. Lalor's conception, design and development of the inventions claimed in the '014 and '082 Patents" because Defendants failed to identify these witnesses in response to Plaintiffs' interrogatory regarding "persons involved in any way with the conception, development, design, and/or actual reduction to practice" of the inventions described by the '014 and '082 Patents. Dkt. # 80 at 17.

Pursuant to Rule 26(e)(1), a party must supplement its discovery responses "in a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A). Although Defendants do not dispute that they did not identify Mr. Robins or Mr. Nunn in response to the relevant interrogatory and they did not supplement their responses pursuant to Rule 26(e), these witnesses were disclosed in Defendants' initial disclosures.  Dkt. # 89-2 at 2-3. To the extent Plaintiffs were truly surprised by the disclosure of these witnesses, they could have and should have sought leave of Court to depose them following remand from the Federal Circuit more than one year ago rather than seeking to exclude evidence that is both relevant and timely.  Plaintiffs' request to preclude Mr. Robins and Mr. Nunn from testifying about the topics identified in Defendants' initial disclosures is therefore DENIED.

Plaintiffs also seek to preclude Mr. Robins and Kenneth Xiong from testifying about the

dog training collar industry, the business operations of that industry, and the terminology of the '014 and '082 Patents because they were not disclosed as expert witnesses and have not prepared expert reports regarding those topics.  Dkt. # 80 at 17-18.  Defendants do not dispute that these witnesses have not been disclosed as expert witnesses and they have not prepared expert reports under Fed. R. Civ. P. 26(a)(2).  Thus, the Court GRANTS Plaintiffs' request to prohibit Mr. Robins and Mr. Xiong from offering opinions properly governed by Rule 702.  However, the Court cannot yet determine, based solely on the limited arguments of the parties, whether particular statements by these witnesses fall within the confines of Rule 702.  The Court will be in a better position to determine whether particular testimony of these witnesses is admissible at trial and therefore, the parties may renew their positions regarding particular statements during trial and the Court will rule on specific objections at that time.

For all of the foregoing reasons, Plaintiffs' motions *in limine* (Dkt. # 80) are GRANTED IN PART.[1]

DATED this 12th day of September, 2014.

*MS Lasnik*

Robert S. Lasnik
United States District Judge

---

[1] The Court notes that the findings and conclusions in this order, like all rulings *in limine*, are preliminary and can be revisited at trial based on the facts and evidence as they are actually presented. See, e.g., Luce v. United States, 469 U.S. 38, 41 (1984) (explaining that a ruling *in limine* "is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the proffer.  Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling.").  Subject to these principles, the Court issues this ruling for the guidance of the parties.

ORDER GRANTING IN PART
PLAINTIFFS' MOTIONS IN LIMINE                -11-